The ESTATE OF Amos GINOR and Langhorne Plaza Associates, Plaintiffs,

v.

Dennis LANDSBERG, Washington General Corp., Concord Assets Group, Inc., Langhorne Plaza, Inc., Glimcher Holdings Limited Partnership, Glimcher Realty Trust, Greg McMahon, Rosenman & Colin, Robert Mandor, John Does 1–10, and Leonard Mandor, Defendants.

No. 95 CIV. 3998(LBS).

United States District Court, S.D. New York.

Dec. 10, 1996.

---

Yerushalmi, Shiboleth, Yisraeli & Roberts, L.L.P., New York, City (Joseph Yerushalmi, Adam I. Cohen, of counsel), for Plaintiffs.

Kleinberg, Kaplan, Wolff & Cohen, P.C., New York City (Norris D. Wolff, of counsel), for Defendants Dennis Landsberg, Washington General Corp., Concord Assets Group, Inc., Langhorne Plaza, Inc., Greg McMahon, Robert Mandor, John Does 1–10, and Leonard Mandor.

Rivkin, Radler & Kremer, New York City (Joseph J. Ortego, Kevin McElroy, of counsel),for Defendants Glimcher Holdings Limited Partnership and Glimcher Realty Trust EAB Plaza Uniondale.

Rosenman & Colin, L.L.P., pro se., New York City (Robert W. Gottlieb, Arthur S. Linker, Jonathan J. Konoff, of counsel).

## OPINION

SAND, District Judge.

Plaintiffs, the estate of Amos Ginor ("Ginor") and Langhorne Plaza Associates (the "Partnership"), assert claims against various defendants arising from the sale of two shopping centers by the Partnership. Now before the Court are motions for summary judgment pursuant to Rule 56 by defendants Rosenman & Colin ("Rosenman"), Dennis Landsberg ("Landsberg"), and Glimcher Holdings Limited Partnership ("Glimcher Holdings") and Glimcher Realty Trust (the "REIT") (collectively "Glimcher"). Also before the Court is a motion by Glimcher for sanctions pursuant to Rule 11. For the reasons set forth below, defendants' motions for summary judgment are granted in their entirety. Glimcher's Rule 11 motion is denied.

## I.

## BACKGROUND

A. *Facts*

This action centers upon the sale of two shopping centers (the "Properties") by the Partnership to Glimcher Holdings in January, 1994. Am. Compl. ¶¶ 51–52. Following the sale, Glimcher Holdings contributed the Properties to the REIT, which was in the

process of going public. *Id.* ¶¶ 9–10. The Properties are two shopping centers located in Pennsylvania, each containing a retail store leased to K–Mart Corporation ("K–Mart"). *Id.* ¶ 14.

The history of this transaction is summarized as follows.

### 1. The Formation of the Partnership

The Partnership was formed in mid–1983 by defendant Concord Assets Group, Inc. ("Concord"), a corporation controlled by defendants Robert Mandor and Leonard Mandor. *Id.* ¶¶ 2, 7. From the inception of the Partnership, Amos Ginor (who died in early January, 1994), and subsequently his estate, was the sole limited partner, owning a 99% interest in the Partnership. *Id.* ¶ 2. The 1% general partner interest was owned by Landsberg from 1983 through 1991, and subsequently by defendant Washington General Corporation ("Washington").[1] *Id.* ¶¶ 3–4. Washington is a subsidiary of Concord; Robert Mandor was at all relevant times Washington's president. *Id.* ¶¶ 4–5.

### 2. The Partnership's Acquisition of the Properties

The Partnership acquired the Properties in 1983. *Id.* ¶¶ 18–19. The Properties were originally owned by one Kenneth Zeisler ("Zeisler"), subject to a mortgage on one of the Properties held by Seamen's Bank (the "Seamen's mortgage") and a mortgage on the other Property held by Prudential Insurance Company (the "Prudential mortgage"). *Id.* ¶ 17.

Defendant Langhorne Plaza, Inc. ("Plaza Inc."), also a Concord subsidiary, acquired the Properties from Zeisler in August, 1983 for approximately $ 7.1 million, with Plaza Inc. paying partly in cash, partly by assuming the Seamen's and Prudential Mortgages, and partly by granting Zeisler a long-term note secured by a purchase money mortgage (the "Zeisler mortgage"). *Id.* ¶ 18. Plaza Inc. then sold the Properties to the Partner-

ship for approximately $ 7.5 million.[2] *Id.* ¶ 19. The Partnership paid for the Properties partly in cash, partly by a short-term note, and partly by a longterm note secured by a purchase money wrap mortgage (the "wrap mortgage"). *Id.*

### 3. The *Rabin* Class Action

In 1989, a class action was commenced before this Court on behalf of all investors in various Concord-created limited partnerships, including the Partnership, alleging fraud against Landsberg, Concord, Plaza Inc., Robert and Leonard Mandor, and other related entities. *See Rabin v. Concord Assets Group, Inc.*, No. 89 Civ. 6130(LBS), 1995 WL 645441 (S.D.N.Y. Nov.2, 1995). A settlement agreement (the *"Rabin* settlement") was reached, which this Court approved in November, 1991. *Id.* at *1.

The *Rabin* settlement contained two provisions that are of particular relevance to the instant motions. First, the settlement provided that Landsberg would be removed as general partner of the Partnership, to be replaced by Washington. Am. Compl. ¶ 31a. Second, the general partner was given the authority to sell the property of the Partnership without the consent of the limited partner. *Id.* ¶ 31e.

### 4. Ginor's Attempts to Remove Washington

Plaintiffs allege that Amos Ginor entered into negotiations with Concord in mid–1992 in an attempt to acquire Washington's 1% general partner interest. *Id.* ¶ 32. Plaintiffs allege that an oral agreement was reached in the Spring of 1993, pursuant to which Ginor would receive the 1% general partner interest, along with satisfaction of the wrap mortgage, in exchange for the sum of $ 600,000. *Id.* ¶ 36. The existence of this oral agreement is disputed.

Plaintiffs allege that formal documentation memorializing this agreement was promised by Concord but never delivered. *Id.* ¶¶ 37–

---

**1.** Subsequent to the sale of the Properties to Glimcher, Washington was replaced as general partner by the Ginor Company, Inc., a corporation wholly owned by Ginor's widow. Am. Compl. ¶ 2.

**2.** After this acquisition, the Properties represented substantially all of the assets of the Partnership. Am. Compl. 10.

38. Ginor thereafter decided to exercise the right, which he possessed under the partnership agreement, to remove Washington as general partner. *Id.* ¶ 43. Several attempts were then made by Ginor and his representatives to contact Concord, Washington, Landsberg and Robert Mandor from November, 1993 through January, 1994, by both mail and telephone. *Id.* ¶¶ 44–49. In particular, on January 3, 1994, a letter was sent purporting to terminate Washington as general partner, effective 30 days after mailing of the letter. *Id.* ¶ 45. Plaintiffs allege that these communications were not answered until after the sale of the Properties had closed. *Id.* ¶¶ 44–49.

### 5. The Sale of the Properties to Glimcher

Washington, acting as general partner of the Partnership, contracted to sell the Properties to Glimcher Holdings in November, 1993, for $ 5,654,781. *Id.* ¶ 51. The sale closed on January 26, 1994. *Id.* ¶ 52. The sale of the Properties was part of a larger block sale, in which 46 properties owned by various Concord-created limited partnerships were sold to Glimcher Holdings. *Id.* ¶ 56. Rosenman represented Washington and all the Concord-created limited partnerships in connection with the sale. *Id.* ¶ 58.

Pursuant to the sale, the Seamen's, Prudential, and Zeisler mortgages were prepaid, and Plaza Inc. received approximately $ 1.3 million in satisfaction of the wrap mortgage. *Id.* ¶ 52. Ginor received only $ 70,310. *Id.* ¶ 53.[3]

Plaintiffs allege that notice of the impending sale was not given to Ginor or his representatives prior to closing. *Id.* ¶ 66. Plaintiffs claim that the sale was detrimental to the interests of Ginor and the Partnership for various reasons, including: the alleged use of a "global sale price" for all 46 properties, which allegedly caused the two Partner-

ship Properties to be sold below their market value; the creation of $ 198,000 in penalties to the Partnership for prepayment of the Seamen's, Prudential, and Zeisler mortgages; the alleged creation of a substantial tax liability on the estate of Ginor through the elimination of a substantial loss which would have accrued to the benefit of the estate had the Properties not been sold; the elimination of the Partnership's alleged ability to prepay the wrap mortgage under circumstances more advantageous than a sale of the Properties; and the allegedly disproportionate allocation of sales proceeds to Plaza Inc. *Id.* ¶¶ 52, 55, 59–62, 74, 77.

### B. *Plaintiffs' Claims*

Plaintiffs' complaint, as amended, asserts several claims against the various defendants.

Plaintiffs allege that Washington, as general partner, breached its fiduciary duties by failing to disclose the sale of the Properties or its terms to Ginor or his representatives before closing, and by selling the Properties below market value under circumstances where a sale was against the best interests of the Partnership and Ginor. *Id.* ¶¶ 77, 79, 84, 90–91.

Plaintiffs allege that all other defendants, including Rosenman, Glimcher, and Landsberg, engaged in actual and constructive fraud and breach of fiduciary duty by participating in the sale of the Properties knowing that Washington had breached its fiduciary duties. *Id.* ¶¶ 78–86, 89–95. Plaintiffs also allege that Rosenman committed professional malpractice in its representation of the Partnership. *Id.* 96–99. Finally, plaintiffs allege that Concord, Plaza Inc., Landsberg, and Robert and Leonard Mandor breached the *Rabin* settlement by causing Washington to breach its fiduciary duties. *Id.* ¶¶ 100–03.[4]

---

3. The *Rabin* settlement provided that, upon a sale of the Properties, "[n]et proceeds therefrom shall be allocated and distributed 11% to [the Partnership] and 89% to the holder of the Wrap Note ..." *Rabin,* 1995 WL 645441 at *3.

  Plaintiffs allege that the $ 1.3 million received by Plaza Inc. should have gone to the Partnership under the terms of the wrap mortgage. *Id.* ¶ 55.

4. Plaintiffs also assert a rescission claim against all defendants, which is set forth as a separate "cause of action" in the amended complaint. Am. Compl. ¶¶ 104–07. It is clear that this is not a separate substantive claim, but merely a demand for relief.

## II.

### *DISCUSSION*

#### A. *Summary Judgment Standard*

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). The court must view the facts in the light most favorable to the non-moving party, and must resolve all ambiguities and draw all inferences against the moving party. *Coach Leatherware Co. v. AnnTaylor, Inc.,* 933 F.2d 162, 167 (2d Cir.1991). In determining whether to grant a motion for summary judgment, the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of establishing the absence of a material issue of fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). However, if the non-moving party would bear the burden of proof on a claim at trial, as plaintiffs would in this case, then the moving party may satisfy its burden by demonstrating an absence of evidence to support an essential element of such a claim. *Id.* at 325, 106 S.Ct. at 2553–54. To defeat the motion, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), but instead must point to evidence sufficient to establish each element of its case—evidence, that is, such that a reasonable jury could return a verdict for the non-moving party on that element. *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552; *Anderson,* 477 U.S. at 248–49, 106 S.Ct. at 2510–11; *Burke v. Jacoby,* 981 F.2d 1372, 1379 (2d Cir.1992).

**5.** The parties have briefed and argued this case under New York law. Hence, we will apply New York law.

#### B. *The Fraud Claims*

Plaintiffs assert claims for actual and constructive fraud against all defendants. The traditional elements of a fraud claim are: 1) a misrepresentation of a material fact; 2) which was false and known to be false by the defendant; 3) made for the purpose of inducing the other party to rely upon it; 4) justifiable reliance by the other party; and 5) injury. *Lama Holding Co. v. Smith Barney, Inc.,* 88 N.Y.2d 413, 646 N.Y.S.2d 76, 79–80, 668 N.E.2d 1370, 1373 (1996).[5] However, if there is some fiduciary or confidential relationship between the parties so as to create a duty of disclosure, then the plaintiff's case becomes easier. In such circumstances, non-disclosure is deemed tantamount to an affirmative misrepresentation, and the plaintiff is not required to show knowledge that false representations were being made. *See Nasaba Corp. v. Harfred Realty Corp.,* 287 N.Y. 290, 39 N.E.2d 243, 245 (1942); *Young v. Keith,* 112 A.D.2d 625, 492 N.Y.S.2d 489, 490 (1985); *Brown v. Lockwood,* 76 A.D.2d 721, 432 N.Y.S.2d 186, 193–94 (1980).

Plaintiffs allege that all defendants had knowledge of material information relevant to the sale of the Properties, including: the negotiation of the sale, the execution of the sales contract in November, 1993, and the closing on January 26, 1994; the alleged use of a "global sale price" for all 46 properties; the alleged fact that the two Partnership Properties were sold below fair market value; and the fact that the sale of the Properties was financially detrimental to Ginor. Am. Compl. ¶¶ 77–78. Plaintiffs claim that Washington breached its fiduciary duty by failing to disclose such information to Ginor or his representatives, and that the other defendants acted with "fraudulent intent" by participating in the sale while aware that Washington had breached its fiduciary duty. *Id.* ¶¶ 79–83. Plaintiffs allege that, if defendants had informed Ginor or his representatives of the existence and terms of the sale ahead of time, legal steps could have been taken to stop it. *Id.* ¶ 85.

Plaintiffs do not allege that Rosenman, Glimcher, Landsberg, or any representative of these defendants made any affirmative misrepresentation to plaintiffs. Hence, plaintiffs cannot maintain a traditional claim of actual fraud. If plaintiffs' fraud claims are to survive as against any defendant, they must be based upon the existence of a fiduciary or confidential relationship which created a duty of disclosure running from that defendant to plaintiffs, thus coming within the principle that nondisclosure by one with a fiduciary or confidential relationship is tantamount to an affirmative misrepresentation. *See Nasaba Corp.*, 39 N.E.2d at 245; *Young*, 492 N.Y.S.2d at 490–91. If such a relationship is found, plaintiffs will be required to present sufficient evidence for a reasonable jury to conclude that the defendant in question had knowledge of the facts which allegedly were not disclosed to Ginor, and to conclude that such facts fell within the scope of that defendant's duties to Ginor. *See Nasaba Corp.*, 39 N.E.2d at 245 (stating that "[c]oncealment ... of facts which one is dutybound in honesty to disclose is of the same legal effect and significance as affirmative misrepresentations of fact."); *Copland v. Nathaniel*, 164 Misc.2d 507, 624 N.Y.S.2d 514, 520 (Sup.Ct.1995) (holding that plaintiff failed to establish fraud claim where defendant had disclosed all information which defendant knew).

### 1. Rosenman

■ Rosenman argues that it owed no fiduciary duty to Ginor or his estate because Rosenman represented the general partner and the Partnership, and did not represent the limited partner. We agree.

■ It is clear that Rosenman represented only the general partner (Washington) and the Partnership, not Ginor or his

estate. *See* Yunis Dep. Dated Aug. 7, 1996 at 18–19. It is well-settled that an attorney owes no fiduciary duty to a third party with whom the attorney is not in privity. *See Schlaifer Nance & Co. v. Estate of Warhol*, 927 F.Supp. 650, 661 (S.D.N.Y.1996) (holding that attorney owed no duty of disclosure to non-client and hence could not be liable in fraud for nondisclosure); *Ackerman v. National Property Analysts, Inc.*, 887 F.Supp. 494, 507–08 (S.D.N.Y.1992) (holding that counsel for limited partnership owed no fiduciary duty to limited partners and thus could not be liable for nondisclosure); *Quintel Corp. v. Citibank*, 589 F.Supp. 1235, 1239–42 (S.D.N.Y.1984) (holding that title counsel for partnership owed no fiduciary obligation to limited partner, absent evidence to establish attorney-client relationship between counsel and limited partner); *Alpert v. Shea, Gould, Climenko & Casey*, 160 A.D.2d 67, 559 N.Y.S.2d 312, 315–16 (1990) (holding that law firm which issued opinion letters in connection with creation of tax shelter owed no fiduciary duty to investors in the shelter).[6] As attorney for the Partnership and the general partner, Rosenman's fiduciary duties ran only to those entities. Hence, Rosenman cannot be liable in fraud for failure to disclose information to Ginor or his estate. There is no allegation that Rosenman withheld any information from Washington, which, as sole general partner, was the acting representative of the Partnership. Rosenman thus discharged whatever duties of disclosure it may have had in relation to the sale of the Properties.

Furthermore, even if we assume *arguendo* that Rosenman had a duty of disclosure running to Ginor, there is insufficient evidence to support a finding that Rosenman had knowledge of the facts which allegedly were not disclosed to Ginor, and insufficient evi-

---

**6.** We note that New York law does recognize an exception. Under this exception, a professional may be held liable to a third party with whom he is not in privity if the professional issues an inaccurate report, and 1) the professional is aware that his report is to be used for a particular purpose; 2) a known party is intended to rely on the report for furtherance of that purpose; and 3) there is some conduct on the professional's part linking the professional to the third party which evinces the professional's under-

standing of the third party's reliance. *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 443–44, 483 N.E.2d 110, 118 (1985); *Alpert*, 559 N.Y.S.2d at 315–16. This exception is clearly not applicable here. There is no evidence that Rosenman was aware of or intended any reliance by the limited partner on Rosenman's statements or conduct, nor is there any evidence of conduct on Rosenman's part evincing a belief that the limited partner would so rely.

dence to support a finding that Rosenman had knowledge of Washington's alleged failure to keep Ginor informed.

First, there is no evidence to support plaintiffs' allegation that Rosenman was aware of the alleged "global sale price" or aware of the alleged fact that the Properties were sold below market value.[7] Joel Yunis, the Rosenman attorney in charge of the firm's representation of the Partnership, testified that Rosenman had no involvement in negotiating the sale price for the 46 properties. Yunis Dep. at 30, 32. Yunis testified that he relied on the representations of Robert Mandor, Washington's president, who informed Yunis that the price was above fair market value because Glimcher was willing to pay a premium for a package of properties. *Id.* at 16, 28–29, 31–35, 46. Yunis felt that such reliance was warranted because Mandor was "actively involved in the real estate market," and Mandor believed that a package sale would bring a higher price than piecemeal sales of individual properties. *Id.* at 46. Yunis' testimony is not contested by any evidence.

Second, there is no evidence that Rosenman was aware that the sale of the Properties would have been financially detrimental to Ginor. There is no evidence that Rosenman was aware of the alleged harmful tax consequences of the sale. Yunis testified that Rosenman did not handle any tax aspects of the sale, other than the real estate transfer tax, *id.* at 52, and there is no evidence that Rosenman, which did not represent Ginor, had any knowledge of the facts necessary to form a judgment as to the effects of a sale on Ginor's tax liability. Plaintiffs also allege that the Partnership had a right to prepay the wrap mortgage under circumstances far more advantageous than a sale of the Properties, but there is no evidence that Rosenman was aware of this alleged fact. Yunis testified that Rosenman did not review any mortgage documents. *Id.*

at 62–63. Furthermore, Yunis testified that Robert Mandor informed him that a sale of the Properties was an opportunity which the Partnership "had to take," because K–Mart was suffering from competition by Wal–Mart and was in danger of abandoning the Properties. *Id.* at 31. None of this testimony is contradicted.

Third, there is no evidence that prior to the closing Rosenman was aware of Ginor's attempts to buy out or remove Washington as general partner. Plaintiff's principal evidence is a handwritten document dated January 28, 1994 (two days after the closing of the sale) which consists of a list of documents labelled "Fed X To Norris Wolfe," apparently referring to Norris Wolff, attorney for Landsberg, Washington, Concord, Plaza Inc., and the Mandors. *See* Cohen Affirm. Dated Oct. 10, 1996 Ex. 14. Included on the list are a December, 1993 letter from Amos Ginor and a January, 1994 letter from Ginor's counsel, Adam Cohen—letters seeking to terminate Washington as general partner. *See id.* Ex. 8. This document hardly supports an inference that Rosenman was aware of Ginor's attempts to remove Washington as general partner prior to the sale of the Properties. Karen Renza, a Concord employee, submitted an affidavit stating that she drafted this list, that it was a list of documents sent to Norris Wolff, and that none of the documents were sent to Rosenman. Renza Reply Aff. Dated Nov. 15, 1996 ¶¶ 1–4. Yunis' affidavit states that he did not receive the handwritten document, or any documents listed on it, until March, 1994. Yunis Reply Aff. Dated Nov. 18, 1996 ¶ 8. Furthermore, the document was clearly prepared after the sale had closed. *See* Renza Reply Aff. 3.

Finally, there is no evidence that Rosenman was aware of Washington's alleged failure to inform Ginor of the sale or its terms prior to closing. Plaintiffs' principal evidence here is a May 11, 1993 letter of intent signed by representatives of Glimcher and

---

7. The price for the 46 properties was calculated using a uniform capitalization rate, rather than through use of appraisals. *See* R. Mandor Dep. Dated Aug. 1, 1996 at 52–56. As described by Robert Mandor, the calculation was as follows: "[Y]ou take the net operating income before debt from the actual rents of the property, and you use a capitalization rate to figure out what the price is . . . [For example,] [i]f you have a million dollars of operating income, you divide that by the [capitalization rate]." *Id.* at 52. It is the use of this uniform rate which is the basis for plaintiffs' allegation of a "global sale price."

Concord. *See* Cohen Affirm. Dated Oct. 10, 1996 Ex. 7. The letter purports to prohibit disclosure of information about the pending sale. It provides:

> Unless and until the transaction contemplated hereby shall have been consummated, Purchaser [Glimcher] and the Company [Concord] *shall hold all information and documents received from the other party in strictest confidence,* except such information and documents available to the public . . .

*Id.* (emphasis added). This letter is hardly persuasive evidence, for several reasons. First, on its face, it merely purports to prevent Concord from disclosing information obtained *from Glimcher.* Hence, it would not have prevented Washington from informing Ginor of Washington's desire to sell the Properties, or Washington's plan to engage in a package sale of the 46 properties, or Washington's desire to use a capitalization rate pricing method. Furthermore, the letter clearly was not intended to prohibit transfer of information *within the selling group,* and thus would not have prohibited disclosure to Ginor. Robert Mandor testified that the letter simply reflected the parties' agreement that "for a short period of time we weren't going to market the deal." R. Mandor Dep. at 104. This is corroborated by the testimony of David Glimcher, who participated in the negotiations on behalf of Glimcher, that the purpose of the nondisclosure provision in the May 11 letter was simply to prevent premature public release of information about the impending sale, in order to avoid affecting potential investors in the REIT. David Glimcher Dep. Dated July 10, 1996 at 116–17. David Glimcher testified that this is a "standard provision" in transactions of this type, and that it was not intended to keep information from reaching the limited partner. *Id.* at 118–19. Further-

more, the May 11 letter states that it was to expire sixty days after execution, *see* Cohen Affirm. Dated Oct. 10, 1996 Ex. 7; hence, the letter would have had no effect after July 11, 1993, several months before the closing of the sale in January, 1994. In short, the May 11 letter simply could not have put Rosenman or anyone else on notice of any alleged desire by Washington to keep Ginor in the dark about the impending sale.[8]

Rosenman's motion for summary judgment on the fraud claims is therefore granted.

## 2. Glimcher

■ Like Rosenman, Glimcher argues that it owed no fiduciary duty to Ginor or his estate, and hence cannot be liable in fraud for any failure to disclose information to Ginor or his representatives. We agree.

It is difficult to envision how one who purchases property from a partnership would owe a duty of disclosure to a limited partner of the selling partnership. Plaintiffs purport to find such a duty in the line of cases which hold that a party to a transaction has a duty to disclose if: 1) the party has superior knowledge of certain information; 2) the information is not readily available to the other party; and 3) the first party knows that the second party is acting on the basis of mistaken knowledge. *Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 155 (2d Cir.1995); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank,* 731 F.2d 112, 123 (2d Cir.1984). These cases are inapplicable here.

First, it is clear that Ginor and his estate were not "parties to the transaction." Glimcher dealt only with Washington, which, as general partner, was the sole representative of the Partnership in connection with the sale. Indeed, Glimcher received an opinion letter from Rosenman which stated that

---

**8.** Furthermore, Rosenman clearly relied on the provision in the *Rabin* settlement which allowed the general partner of the various Concord-created limited partnerships to sell the partnerships' property without the consent of the limited partners. *See* Cohen Affirm. Dated Oct. 10, 1996 Ex. 10 at 26. It is true, as plaintiffs contend, that this provision did not give the general partner a license to breach its fiduciary duties. However, this provision provides clear evidence

that Rosenman reasonably believed that the sale was not in violation of any rights of the limited partner. *See* Yunis Dep. at 44–45. In addition, Yunis testified that the various Concord-created limited partnerships involved in the Glimcher sale included *two to three thousand limited partners*—certainly, Rosenman could not have been expected to insure that Washington and Concord kept all of these limited partners fully informed. *See id.* at 50–51.

Washington had full power and authority to act for the Partnership, and that the sale was a binding obligation on the Partnership. *See* McElroy Aff. Dated Oct. 17, 1996 Ex. E. It is not alleged that Glimcher had any "superior knowledge" which Washington did not possess—indeed, plaintiffs' case is based on the assertion that Washington had full knowledge of the terms of the sale but did not disclose such to Ginor.

Second, even if we were to assume that Ginor or his estate was a party to the transaction, there is no evidence that Glimcher had knowledge of the facts which allegedly were not disclosed to Ginor, and no evidence that Glimcher was aware of Washington's alleged failure to keep Ginor informed. Plaintiffs' principal evidence is the May 11 letter of intent. For the reasons discussed above, that letter provides no basis to infer that Glimcher, or anyone else, was aware of any failure on Washington's part to give information to Ginor. Plaintiffs' other evidence is mere speculation. Plaintiffs point out that Glimcher utilized a team of accountants to conduct a financial review of the Properties, and state without foundation that such a review must have revealed that the sale was not advantageous to the limited partner. Plaintiffs also assert that Glimcher had engaged in prior transactions with Concord in the 1970's or early 1980's, and that this somehow shows that Glimcher was aware of improper conduct by Washington and Concord in connection with the sale of the Properties. Such speculation is insufficient to create a material issue of fact.

By contrast, the testimony of David Glimcher, Robert Mandor, and Ginor's associate, Eldad Ben–Yosef, reveal that the sale negotiations included no reference to Ginor, that Glimcher had no knowledge of Ginor's attempts to buy out or remove Washington, that Glimcher had no knowledge that Ginor was unaware of the terms of the sale, that Glimcher never had any communications with Ginor or his representatives during the negotiations, that Glimcher had no indication that the sale may have been detrimental to any limited partner, and that Glimcher believed the negotiations to be a fair, arm's-length transaction in which "they [the Partnership] tried to get as much as they could for the properties and we [Glimcher] tried to pay as little as we could." *See* Glimcher Dep. at 119–20, 125, 139; R. Mandor Dep. at 240, 242; Ben–Yosef Dep. Dated Oct. 20, 1995 at 110–15.

Glimcher's motion for summary judgment on the fraud claims is therefore granted.

### 3. Landsberg

■ Landsberg asserts that he had no interest in or position with Washington, Concord, Plaza Inc., or the Partnership from 1992 through the closing of the sale, and thus was not in a fiduciary relationship with Ginor at the time of the events in question and was not in a position to learn any facts about the sale or its surrounding circumstances. We agree.

At the time of the Partnership's formation in 1983, Landsberg was the general partner, as well as a shareholder and vicepresident of Concord. Landsberg Dep. Dated Aug. 2, 1996 at 10, 29; Am. Compl. ¶ 3. Landsberg testified that he relinquished his shares in Concord, and ceased his employment there, in 1988. Landsberg Dep. at 39, 44, 58–59. Under the November, 1991 *Rabin* settlement, Landsberg was to be replaced by Washington as general partner, effective December 31, 1991. *Id.* at 6; Am. Compl. ¶¶ 3–4, 31a. Hence, Landsberg had no business ties to Concord, Washington, or the Partnership from 1992 to 1994, and thus could not have owed any fiduciary obligation to Ginor at the time of the negotiation and closing of the sale of the Properties.

Plaintiffs nevertheless assert that Landsberg remained in the position of a fiduciary after 1991, but plaintiffs present no evidence to support this. Plaintiffs present a phone message slip apparently generated by a Concord employee in response to a call by Adam Cohen on January 28, 1994, which has the names "Bobby" & "Dennis" written at the top. *See* Cohen Affirm. Dated Nov. 6, 1996 Ex. 3. Plaintiffs argue that this indicates that Landsberg retained some ties to Concord in 1994. Plaintiffs also present a document dated June 13, 1993 entitled "CONCORD ASSETS GROUP, INC. OWNERSHIP SUMMARY CHECKLIST," which

lists Landsberg and Washington as general partners.[9] *See id.* Ex. 2. Plaintiffs also cite Landsberg's testimony that Leonard Mandor had told him about the Glimcher sale some time in 1994. *See* Landsberg Dep. at 103.

However, such evidence does not create a genuine issue as to whether Landsberg owed any fiduciary obligations to Ginor during the time period at issue in this litigation. The Partnership's certificate was amended in April, 1992 to state that Landsberg had withdrawn as general partner effective January 1, 1992, as the *Rabin* settlement had dictated. *See* Wolff Aff. Dated Oct. 1, 1996 Ex. E. Indeed, plaintiffs' complaint concedes that Landsberg ceased to act as general partner in late 1991. *See* Am. Compl. ¶¶ 3–4, 31a. Plaintiffs' evidence raises an inference of nothing more than continuing social ties between Landsberg and employees of Concord after 1991. Landsberg testified that he continued to visit Concord's offices "[o]n occasion ... just for social purposes," and that his conversation with Leonard Mandor about the sale was "[j]ust talking one day." Landsberg Dep. at 92, 103. In short, it is clear that Landsberg occupied no position during 1992 to 1994 which would have entailed any duties to Ginor.

Even if we were to assume that Landsberg owed a fiduciary duty to Ginor after 1991, there is insufficient evidence to support a finding that Landsberg had any knowledge of the terms of the sale, or knowledge of the alleged fact that the sale was detrimental to Ginor, or knowledge of the alleged fact that Washington did not keep Ginor fully informed. Plaintiffs' sole evidence is Landsberg's testimony that Leonard Mandor told him about the sale sometime in 1994. Landsberg could not remember whether this conversation occurred before or after the closing of the sale, and he did not remember Mandor mentioning anything about the pricing of the sale. *Id.* at 103–04. This is not sufficient to defeat Landsberg's motion. Furthermore, though some of the calls and

letters sent by Ginor and his representative attempting to remove Washington as general partner were addressed to Landsberg, these communications were sent to Concord's offices, and there is no evidence that Landsberg received them.[10] *See* Cohen Aff. Ex. 4.

Landsberg's motion for summary judgment is therefore granted as to the fraud claims.

### C. The Breach Of Fiduciary Duty Claims

■■■ Plaintiffs assert that all defendants knowingly participated in Washington's alleged breach of fiduciary duty by becoming involved in the sale despite knowing that Washington had failed to inform Ginor of the sale and its terms, that the Properties were sold below market value, and that there was an "inherent conflict of interest" between Washington and plaintiffs. Am. Compl. ¶ 92. The elements of a claim of knowing participation in a breach of fiduciary duty are: 1) a breach by a fiduciary of obligations owed to another; 2) that the defendant knowingly induced or participated in the breach; and 3) that the plaintiff suffered damages as a result. *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 281–82 (2d Cir.1992). The second element requires knowledge of the primary violator's status as a fiduciary, knowledge that the primary violator's conduct contravenes his fiduciary duty, and "participation" in the primary violator's breach. *Id.* at 282–84. A defendant may be charged with constructive knowledge of the primary violator's breach if he is on notice of conduct which may constitute a breach and fails to undertake a reasonable investigation. *Id.* at 283. A defendant "participates" in the primary violator's breach if he affirmatively assists in it, or helps to conceal it, or enables it to occur by failing to act when required. *Id.* at 284.

■■ We conclude that there is insufficient evidence to support a finding that these elements are satisfied as against Rosenman, Glimcher, or Landsberg. Our discussion of

---

**9.** This document was certainly erroneous—the evidence is undeniable that Landsberg ceased to act as general partner after 1991.

**10.** Landsberg testified that he was informed by Concord that all limited partners were told of his resignation as general partner. Landsberg Dep. at 93.

the fraud claims reveals that there is insufficient evidence to support a finding that these defendants had any indication of Washington's alleged failure to inform Ginor of the sale or its terms. Similarly, there is insufficient evidence to support a finding that these defendants had any reason to believe that the sale price was below market value, or that the sale was detrimental to the limited partner. By contrast, all credible evidence indicates that none of these defendants had any indication that Washington was acting in violation of its fiduciary duties.

We therefore grant summary judgment to defendants Rosenman, Glimcher, and Landsberg on the breach of fiduciary duty claims.

### D. *The Malpractice Claim*

Plaintiffs allege that the Rosenman firm engaged in professional malpractice in several respects: by failing to disclose the sale and its terms to Ginor; by acting under a "conflict of interest" in representing the general partner and all the various Concord-created limited partnerships in connection with the sale; by issuing the opinion letter to Glimcher when Rosenman allegedly knew or should have known that the sale was in violation of Washington's fiduciary duties; and by allowing the Partnership to receive an allegedly unsatisfactory distribution of proceeds from the sale. Am. Compl. 1 98.

■ To establish a malpractice claim, a plaintiff must present evidence that his attorney failed to exercise such degree of care, skill, and diligence commonly possessed and exercised by a member of the legal community. *Greene v. Payne, Wood & Littlejohn,* 197 A.D.2d 664, 602 N.Y.S.2d 883, 885 (1993). We conclude that plaintiffs have failed to present sufficient evidence to permit a finding that Rosenman fell below the requisite standard of care.

■ As an initial matter, it is clear that Rosenman owed no duty of care to Ginor or his estate, because there was no privity between Rosenman and Ginor. As discussed above, a lawyer owes no fiduciary duties to

one with whom he is not in privity. *See Quintel Corp.,* 589 F.Supp. at 1239–41. Hence, a lawyer generally cannot be liable in negligence to a non-client. *See Ahmed v. Trupin,* 809 F.Supp. 1100, 1106 (S.D.N.Y. 1993); *Calamari v. Grace,* 98 A.D.2d 74, 469 N.Y.S.2d 942, 945 (1983). Rosenman represented only the general partner and the Partnership, not Ginor or his estate. Hence, a malpractice claim may be asserted against Rosenman only by or on behalf of the general partner or the Partnership. We must therefore dismiss the malpractice claim insofar as it alleges a failure to disclose information to Ginor.

■ The allegation that Rosenman was under a conflict of interest in representing the general partner and all the Concord-created limited partnerships in connection with the sale must also fail. It is not self-evident that Rosenman breached the applicable standard of care in the legal profession by engaging in such representation. Plaintiffs have presented no expert affidavits or testimony to indicate whether such a representation is considered improper in the legal profession.[11] Under New York law, "unless the ordinary experience of the fact-finder provides sufficient basis for judging the adequacy of the professional service, or the attorney's conduct falls below any standard of due care, expert testimony will be necessary to establish that the attorney breached a standard of professional care and skill." *Greene,* 602 N.Y.S.2d at 885; *see also O'Brien v. Spuck,* 99 A.D.2d 910, 472 N.Y.S.2d 514, 516–17 (1984) (affirming dismissal of legal malpractice claim where plaintiff failed to produce expert evidence to establish applicable standard of care in the field). Accordingly, there is no basis in the record for a factfinder to conclude that Rosenman's representation was improper.

Plaintiffs' allegation that Rosenman improperly issued the opinion letter to Glimcher must also fail. As discussed in the context of the fraud claims, there is no evidence that Rosenman believed the sale to be in violation of the limited partner's rights. Yunis' testi-

11. We note that a transaction such as the block sale to Glimcher would be quite cumbersome and expensive if the parties were required to use separate legal counsel for each of the partnerships involved.

mony reveals that a high level of care was taken before issuing the letter—Rosenman solicited the opinion of local counsel in Pennsylvania (where the Partnership was formed), reviewed the *Rabin* settlement and Washington's corporate documents, and concluded that the sale was within the powers of Washington as general partner. *See* Yunis Dep. at 44–45, 62. In light of plaintiffs' failure to produce expert evidence as to Rosenman's role in the transaction, there is no basis for a finding of malpractice here.

 Finally, there is no evidence that Rosenman acted negligently in reference to the allegedly unsatisfactory allocation of sale proceeds. There is no evidence that Rosenman was involved in the allocation of the sale proceeds, and plaintiffs have not presented any expert evidence indicating that Rosenman should have played a greater role in such allocation.

We therefore grant Rosenman's motion for summary judgment as to the malpractice claim.

### E. *The Breach Of Contract Claims*

Finally, plaintiffs assert that Landsberg, Concord, Plaza Inc., and Robert and Leonard Mandor breached the Rabin settlement by "causing Washington to act in a manner not in the best interest of the Partnership and Ginor and failing to notify Ginor of the sale of the Properties prior to their sale." Am. Compl. 102.

This claim has no merit as against Landsberg. As discussed above, there is no evidence that Landsberg played any role whatsoever in the sale of the Properties to Glimcher; indeed, there is no evidence that Landsberg had any business connection to any of the parties after 1991. The *Rabin* settlement itself provided that Landsberg would step down as an active player in the Partnership.

Landsberg's motion for summary judgment as to the breach of contract claim is therefore granted.[12]

## III.

### CONCLUSION

For the reasons set forth above, the motions for summary judgment by Rosenman, Glimcher, and Landsberg are granted. Glimcher's motion for sanctions is denied.

**SO ORDERED.**

---

12. We deny Glimcher's motion for Rule 11 sanctions. We note that Glimcher has not complied with Rule 11(c)(1), which requires that a motion for sanctions be made and served *separately* from other motions. Furthermore, we would deny the motion even if there were no procedural defects because, although we find plaintiffs' claims to be without merit, we do not believe their assertion to be sanctionable.